UNITED STATES DISTRICT COURT WESTERN DISTRICT OF VIRGINIA
- CHARLOTTESVILLE DIVISION

CLERK'S OFFICE U.S. DISTRICT. COURT
AT CHARLOTTESVILLE, VA
FILED

SEP 0 8 2025

LAURA A. AUSTIN, CLERK
BY:
DEPUTY CLERK

Mohammed Azimi,
    Plaintiff,

v.

Jeremy M. Lavin, et al.,
    Defendants.

Civil Action No.  *3:25-cv-00069*

## COMPLAINT

1. **Introduction:** Plaintiff **Mohammed Azimi** ("Plaintiff"), proceeding **pro se**, brings this civil rights action under 42 U.S.C. §§ 1983, 1985(3), and 1986 to redress the violation of his constitutional rights by Defendants. Plaintiff alleges that Defendants — all acting under color of state law — conspired to selectively **refuse enforcement** of Virginia's child abduction law in retaliation for Plaintiff's protected activities, thereby denying him **equal protection**, **due process**, and the **right to petition**. Plaintiff seeks declaratory and injunctive relief to ensure neutral enforcement of the law, as well as damages for the harm caused.

## Jurisdiction and Venue

2. **Jurisdiction:** This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights jurisdiction). Plaintiff's claims arise under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983, 1985(3), and 1986. Attorneys' fees are recoverable under 42 U.S.C. § 1988(b).

3. **Venue:** Venue is proper in the Western District of Virginia (Charlottesville Division) under 28 U.S.C. § 1391(b), because all Defendants reside in Virginia and the events giving rise to these claims occurred in Albemarle County, Virginia, which lies within this District and Division.

4. **Declaratory & Injunctive Relief:** This action seeks, inter alia, declaratory relief pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, and injunctive relief pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65. Plaintiff also seeks a

litigation hold and preservation order to protect relevant evidence.

## Parties

5. **Plaintiff:** Mohammed Azimi is a citizen and resident of Virginia and the father of two minor children. He proceeds in this matter **pro se**. Plaintiff is the beneficiary of a valid Virginia court order granting him visitation rights with his children. Plaintiff has actively petitioned government agencies (through FOIA requests and court filings) regarding enforcement of his visitation and custody rights, activity which is protected under the First Amendment.

6. **Defendant Detective Jeremy M. Lavin:** Lavin is, on information and belief, a detective with the Albemarle County Police Department ("ACPD"). He is sued in his **individual** and **official** capacities. At all relevant times, Lavin acted under color of state law as a law enforcement officer of Albemarle County. As described below, Detective Lavin was directly involved in refusing to enforce Va. Code § 18.2-49.1 in Plaintiff's case and in conspiring to deprive Plaintiff of equal protection and other rights.

7. **Defendant Sergeant Turner Lowery:** Lowery is a police sergeant with ACPD (on information and belief, Detective Lavin's supervising sergeant). He is sued in his **individual** and **official** capacities. At all relevant times, Lowery acted under color of state law in his capacity as an ACPD supervisor. As described below, Sergeant Lowery personally participated with Lavin in the decision to deny enforcement of the custody/abduction law and aligned with others to thwart Plaintiff's attempts to obtain a remedy.

8. **Defendant Colonel Sean Reeves:** Reeves is the Chief of Police of Albemarle County Police Department (with the rank of Colonel). He is sued in his **official capacity** as the Chief policymaker for ACPD. At all relevant times, Reeves acted under color of state law. As Chief, Reeves is the official responsible for ACPD's policies, practices, and customs – including the handling of parental abduction cases -- and he had the authority to prevent or stop the misconduct of his subordinates. Defendant Reeves is named for purposes of injunctive and declaratory relief and municipal liability (Monell) as more fully set forth herein.

9. **Defendant County of Albemarle:** Albemarle County, Virginia ("the County"), is a municipal entity organized under Virginia law. The County operates and/or oversees the Albemarle County Police Department and is a "person" suable under 42 U.S.C. § 1983. The County is named as a Defendant for purposes of

municipal **(Monell) liability**, as Plaintiff alleges that the constitutional violations resulted from an official policy or a longstanding custom/practice of the County (through ACPD and the Commonwealth's Attorney's Office) to selectively defer or refuse enforcement of the parental abduction statute. At all relevant times, Defendants Lavin, Lowery, and Reeves were employees or agents of Albemarle County or its agencies, acting within the scope of their official duties.

10. **Non-Party Co-Conspirators:** Various other individuals – not named as Defendants here due to their being sued in separate pending litigation – played key roles in the conspiracy and events underlying this case. These include **Stephanie Bunch** (Clerk of the Juvenile & Domestic Relations Court), **Jon Zug** (Clerk of the Circuit Court), **James Hingeley** (Albemarle Commonwealth's Attorney), **Holly Vradenburgh** (Assistant Commonwealth's Attorney), and **Palma Pustilnik** (an attorney associated with the mother or the Commonwealth's Attorney's Office). These non-parties, acting in concert with the named Defendants, are referenced for factual context demonstrating the existence of a **conspiracy** and improper collusion to deprive Plaintiff of his rights. For example, Plaintiff alleges that certain court clerks and prosecutors took steps to interfere with docketing and enforcement actions (as detailed below), and that they advised or influenced Defendants Lavin and Lowery to ignore Plaintiff's complaints. All such individuals were acting under color of state law in their respective official capacities during the relevant events.

## Factual Background

## Custody Order and Mother's Removal of Children

11. On December 17, 2024, the Albemarle County Juvenile & Domestic Relations ("J&DR") Court entered an order granting Plaintiff **supervised visitation** with his minor children. This court order was clear and unambiguous: Plaintiff was entitled to scheduled, supervised contact with his children, and the children's mother (Plaintiff's ex-spouse) was required to comply by making the children available for those visits.

12. Despite the court's visitation order, the children's mother willfully violated it. In or about August 2023 – *even before the order was formally entered on 12/17/2024*, and continuing thereafter – the mother **removed the children from the Commonwealth of Virginia** and cut off all communication between the children and Plaintiff. Since August 2023, Plaintiff has had no contact with his children and has been denied all visitation, supervised or otherwise. The mother's actions

were in blatant violation of the J&DR Court's order granting Plaintiff visitation.

13. Under Virginia law, the mother's conduct in absconding with the children and withholding them out-of-state in violation of a custody/visitation order is not only contemptuous of the court's authority – it constitutes a **criminal offense**. Specifically, Va. Code § 18.2-49.1(A) makes it a **Class 6 felony** to "knowingly, wrongfully and intentionally withhold a child from either of the child's parents … in clear and significant violation of a court order respecting custody or visitation, **provided such child is withheld outside of the Commonwealth**." In other words, when a parent intentionally withholds a child in violation of a custody order and takes the child outside Virginia, the offense is a felony **parental abduction**. By contrast, a violation of a custody order **without** removing the child from Virginia is treated as a misdemeanor for a first offense. In Plaintiff's case, the children were (and remain) located outside Virginia due to the mother's unilateral removal; thus, the facts plainly trigger the felony provision of § 18.2-49.1(A).

14. Plaintiff, desperate to see his children and enforce his rights under the visitation order, continuously sought lawful means to compel the mother's compliance. Between late 2023 and mid-2025, Plaintiff made numerous reports, complaints, and inquiries to local authorities – including the Albemarle County police and the Commonwealth's Attorney's Office – informing them of the mother's violation of the court order and the children's out-of-state abduction. Plaintiff provided documentation of the court's visitation order and requested that the law enforcement authorities take action under Va. Code § 18.2-49.1 to bring the mother to justice and secure his visitation rights.

15. During this time, Plaintiff also pursued relief in the state courts. On August 11, 2025, the Albemarle J&DR Court **docketed a show-cause hearing** against the mother for her violation of the custody/visitation order. The state court scheduled a hearing (in J&DR Court) for the mother to **show cause** why she should not be held in contempt for disobeying the December 2024 visitation order. This hearing was an avenue for Plaintiff to establish the mother's non-compliance and potentially have the court impose sanctions or remedial orders.

## Magistrate Issues Criminal Summons (August 14, 2025)

16. In addition to the civil show-cause process, Plaintiff sought criminal enforcement. On August 14, 2025, after reviewing Plaintiff's complaint and supporting evidence, a Virginia magistrate **found probable cause** to charge the mother with

**violation of a custody order – child abduction** under Va. Code § 18.2-49.1.
The magistrate thereupon issued a *criminal summons* against the mother, with
Offense Tracking Number **003JM2500005488**. The summons charged that the
mother had intentionally violated the custody/visitation order by withholding the
children outside of Virginia (a Class 6 felony as noted above). The summons was
returnable to the Albemarle ~~General District Court~~, with an initial hearing date set
for September 8, 2025.　　JdR

17. The issuance of this criminal summons by a magistrate was a significant
    development. It meant that the Commonwealth of Virginia, through its judicial
    officer, had formally initiated a criminal case against the mother for her alleged
    abduction of the children. A court date was scheduled, and the legal process was
    in motion. Plaintiff reasonably expected that the mother would be brought before
    the court on September 8, 2025, to answer the charge, and that law enforcement
    would take steps to serve the summons and secure her appearance (including
    coordinating with out-of-state authorities if necessary, since the children's
    location was known to be outside Virginia).

18. **Mysterious Deletion of the Criminal Case:** However, shortly after the criminal
    summons was issued on 8/14/2025, the case was *abruptly removed from the
    docket*. Upon checking the court records, Plaintiff discovered that the summons
    (OTN: 003JM2500005488) and the September 8 hearing had effectively
    **vanished** – as if the charge had never been filed. This occurred without any
    notice or explanation to Plaintiff. On information and belief, members of the
    Albemarle Commonwealth's Attorney's Office (in particular, **CA Hingeley** or **ACA
    Vradenburgh**) intervened and caused the criminal charge to be **nolle prossed,
    dismissed, or otherwise deleted** before the mother could be served. Plaintiff
    alleges that this extraordinary step was taken due to improper influence and
    conflict of interest: the Commonwealth's Attorney's Office ("CAO") had prior
    involvement with the mother (either directly or via Attorney Pustilnik) and had
    opposed Plaintiff's efforts in related matters, and thus certain prosecutors did not
    want this charge to proceed. In effect, the **prosecutorial branch quashed a
    valid criminal complaint** – filed by a magistrate – *before* it could reach a judge.
    This interference deprived Plaintiff of a legal mechanism that had been put in
    place for his protection, denying him a meaningful opportunity to be heard at the
    September 8 hearing.

19. The roles of the non-party co-conspirators are particularly evident in the handling
    (and mishandling) of the summons. For instance, **Clerk Bunch** and/or **Clerk Zug**
    had control over the court's docket and records; on information and belief, they

acted at the behest of the CAO to **alter or remove** the record of the criminal case, which may constitute a falsification of public records. Such conduct, if proven, not only violates state law but potentially federal law (e.g. 18 U.S.C. § 1519's prohibition on destroying or altering records to impede an investigation). Likewise, **CA Hingeley** and **ACA Vradenburgh** used their authority to *stop* the enforcement rather than support it, effectively **shielding** the mother from prosecution. These actions set the stage for the events that followed with the police Defendants.

### Police Meeting and Refusal to Enforce (September 2, 2025)

20. Frustrated by the sudden disappearance of the criminal case and still unable to see his children, Plaintiff directly sought help from the Albemarle County Police Department. On September 2, 2025, Plaintiff met **in person** with Defendants **Detective Lavin** and **Sergeant Lowery** at ACPD (hereafter, the "September 2 meeting"). The purpose of this meeting was for Plaintiff to request **law enforcement assistance** in enforcing the December 17, 2024 custody/visitation order and in **pursuing the criminal abduction charges** against the mother. Plaintiff provided Defendants Lavin and Lowery with all relevant documentation, including a copy of the court's visitation order, information on the children's and mother's whereabouts, and a reference to the magistrate's summons that had been issued on August 14.

21. At the September 2 meeting, Defendants Lavin and Lowery **refused to take any enforcement action**. Detective Lavin and Sgt. Lowery informed Plaintiff that they would **not pursue** charges under Va. Code § 18.2-49.1 against the mother. Their justifications for this refusal were legally erroneous and suggest a deliberate misinterpretation of the situation:

- **"Superseding" Protective Order:** Lavin and Lowery claimed that there were existing **protective orders** that *superseded* or nullified the custody/visitation order. Specifically, they referenced one or more protective orders obtained by the mother (or on the mother's behalf) against Plaintiff, and asserted that because such protective orders were in place, the December 17, 2024 visitation order was essentially overridden and unenforceable. This rationale is baseless in law: a protective order (designed to prevent abuse or harassment) does **not** cancel a parent's visitation rights unless the court explicitly modifies those rights. In fact, Virginia law and standard protective order forms often account for existing custody/visitation arrangements rather than nullify them. By treating the protective order as a trump card, the officers relieved themselves of any duty to

enforce the visitation order or the abduction statute. On information and belief, the protective orders in question did **not** expressly forbid Plaintiff's supervised visitation – indeed, the J&DR Court would not have granted visitation on 12/17/2024 if a prior protective order barred all contact. Thus, Defendants' invocation of the protective order was a pretext and/or a product of improper influence by those who helped the mother obtain the order under false pretenses.

- **Misclassification of Offense:** Lavin and Lowery further stated that because this was a "family custody dispute," any offense would be only a **misdemeanor,** and they asserted that Virginia authorities **could not execute service out-of-state for a mere misdemeanor**. This statement ignored the crucial fact that the children were taken **out of Virginia**, which elevated the offense to a **felony** under Va. Code § 18.2-49.1(A). Plaintiff explicitly informed the officers that the mother had taken the children to another state (New York City, in fact) and had kept them there for many months. He even pointed to the language of § 18.2-49.1 and the magistrate's felony summons as evidence. Nonetheless, Defendants persisted in treating the matter as a minor issue unworthy of full police attention. By doing so, they sidestepped the greater resources and interstate coordination that a felony investigation would entail. Their claim that out-of-state service was not possible for a misdemeanor was moot – because the conduct at issue was a **felony**, for which interstate law enforcement cooperation (e.g. extradition or out-of-state service of warrants) is routinely available. In short, Defendants **willfully ignored the felony element** ("withheld outside of the Commonwealth") of the abduction law in order to justify inaction.

22. Plaintiff vehemently objected to the officers' positions during the meeting. He explained that the protective order was being **misused** by the mother to avoid compliance with the visitation order, and that one court order did not cancel out another – both needed to be given effect in a lawful manner. Plaintiff also stressed that denying him access to his children was causing irreparable harm to his familial relationship (a fundamental right). Despite Plaintiff's protests, Detective Lavin and Sgt. Lowery remained unmoved. They stated, in sum and substance, that **their hands were tied** and that they would **"defer to the Commonwealth's Attorney's Office"** on how to proceed (or not proceed) with the case. Lowery specifically indicated that the **Commonwealth's Attorney (Hingeley)** did not wish to pursue the matter, hinting at a *policy* or instruction from above.

23. **Conflict of Interest and Deference to CAO:** By deferring entirely to the Commonwealth's Attorney's Office ("CAO"), Defendants Lavin and Lowery were

following an unofficial **policy/custom** within Albemarle County. Plaintiff alleges that Albemarle County, through the CAO and ACPD leadership, had a practice of **not enforcing parental abduction cases** without the CAO's green light – effectively giving the CAO veto power over police action in what should be straightforward violations of criminal law. In Plaintiff's case, this deference was particularly egregious because the CAO had a **conflict of interest**: Commonwealth's Attorney James Hingeley and ACA Vradenburgh had personal or political connections involving the mother's family or Attorney Pustilnik (who had advocated on the mother's behalf). Thus, the prosecutors were not neutral and had shown animosity toward Plaintiff's cause in the past (for example, by resisting the issuance of the very summons that the magistrate ultimately granted). Lavin and Lowery were aware – or at least had reason to know – that the CAO's stance was tainted by this conflict and by extraneous influences. Yet they chose to **align themselves with the CAO's improper refusal**, rather than exercise independent judgment or seek guidance from a neutral authority (such as the Attorney General or a court). This alignment demonstrates a **selective bias**: had the roles been reversed (e.g., a mother complaining about a father abducting children out-of-state), Plaintiff asserts that ACPD would not have hesitated to enforce the law. In fact, upon information and belief, Albemarle authorities have taken action in similar child custody interference cases when the favored parent was the mother. The disparate treatment afforded to Plaintiff – a father seeking enforcement – is evidence of gender-based bias or personal bias amounting to intentional discrimination.

24. **Retaliatory Animus:** During the September 2 meeting, Plaintiff also discerned a hostile attitude from Defendants Lavin and Lowery regarding Plaintiff's prior activities. By 2025, Plaintiff had filed multiple **FOIA requests** to Albemarle County and the court clerks, seeking records to understand why his case had been handled irregularly. He had also initiated litigation in federal court (against Clerk Bunch, Clerk Zug, Hingeley, Vradenburgh, Pustilnik, among others) challenging what he perceived as a conspiracy to deprive him of his rights. These actions by Plaintiff – though entirely lawful and protected by the First Amendment – apparently irritated local officials. At the meeting, one or both of the Defendant officers made remarks downplaying Plaintiff's concerns and implying that his persistent **"paperwork and complaints"** were not welcome. Sgt. Lowery, for example, noted that he was aware of Plaintiff's "emails and letters." Detective Lavin commented that Plaintiff "had been told before" that nothing more would be done. The tone and context of these remarks indicated that Defendants' refusal to help was not just based on their (incorrect) view of the law, but also on a desire to **punish or marginalize** Plaintiff for being an outspoken critic. In other

words, Defendants were retaliating against Plaintiff for **asserting his rights and seeking information**, by denying him the equal protection and services that any other crime victim would receive.

25. By the end of the September 2, 2025 meeting, it was clear to Plaintiff that the police would **take no further action**. Lavin and Lowery confirmed they would **not** pursue an arrest warrant, would not assist in serving the summons or trying to locate the mother out-of-state, and would not refer the matter to any other agency. They essentially told Plaintiff that, as far as they were concerned, the case was closed.

26. **Ongoing Violation:** From that point (Sept. 2, 2025) to the present, Plaintiff has remained cut off from his children. The December 17, 2024 visitation order has gone unenforced. The mother continues to keep the children outside Virginia, in contempt of the court's decree, with no fear of criminal consequence due to Defendants' protection. Plaintiff's attempts to invoke the law have been met with stonewalling. In effect, **Defendants and their co-conspirators nullified a state court order and a state law for the benefit of a particular individual** (the mother) and to the detriment of Plaintiff. This **selective non-enforcement** strikes at the heart of the Equal Protection Clause, which guarantees that all persons in like circumstances be treated alike under the law.

27. **Comparator Evidence:** Plaintiff is gathering data on how Albemarle County authorities handle other, similar cases of parental abduction or custody order violations. On information and belief, there are instances where *mothers* reporting child abduction by fathers have seen vigorous enforcement, including nationwide Amber Alerts, prompt warrants, and extradition efforts. In stark contrast, Plaintiff (a father reporting abduction by a mother) received no meaningful assistance. Such a pattern, if proven, would demonstrate an invidious **gender-based disparity** or a personal animus-driven disparity in law enforcement – neither of which is constitutionally permissible. Police protection is supposed to be applied **equally and fairly**, and not denied to a disfavored few. Even absent a broad pattern, the facts here present a classic "class-of-one" scenario: Plaintiff was **singled out** for arbitrary and bad-faith treatment (denied enforcement of a law meant for his protection) with no rational basis, which also violates equal protection principles.

28. **Harm to Plaintiff:** As a direct result of Defendants' actions and omissions, Plaintiff has suffered and continues to suffer severe harm. He has lost precious time, relationship, and bonding with his young children – time that can never be

recovered. He has experienced emotional distress, anguish, and despair knowing his children are kept away in defiance of a court order, and that those entrusted to uphold the law conspired to look the other way. Plaintiff also expended resources (time, money, effort) in repeatedly seeking justice through official channels, only to be rebuffed through illegitimate means. Additionally, Plaintiff's faith in the justice system has been badly eroded; he has been shown that, for him, the **courthouse doors were effectively closed**. This latter point is epitomized by the deletion of the magistrate's summons – an outrageous act that denied Plaintiff access to a judicial forum to address the crime against him. The U.S. Court of Appeals for the Fifth Circuit has recognized that **deliberately concealing or obstructing legal processes** to prevent someone from vindicating their rights can violate the Constitution's guarantee of court access. Here, Defendants (together with co-conspirators) impeded the due course of justice in the state courts, thereby denying Plaintiff equal protection and due process in violation of 42 U.S.C. § 1985(2) and (3) (as further discussed in Count IV below).

29. **Summary of Wrongdoing:** In summary, the **factual** foundation of this Complaint is that Defendants Lavin and Lowery, acting in concert with each other and with other county and court officials, intentionally **refused to enforce** a neutral law (Va. Code § 18.2-49.1) **against a particular individual** (the abducting mother), specifically to **deny Plaintiff the benefit and protection of the law**. They did so for improper reasons: personal animus/retaliation against Plaintiff for his prior First Amendment activity, and favoritism or special treatment toward the mother (influenced by the CAO and possibly by biases related to gender or personal connections). The **police discretion** in this case was exercised in a wholly arbitrary and discriminatory manner, not for any legitimate law-enforcement purpose. This selective non-enforcement is actionable under the Equal Protection Clause, as police may not **afford lesser protection** to one class of persons (e.g. fathers seeking child recovery) than to others without exceedingly good cause. Moreover, by collaborating to **obstruct Plaintiff's access to remedies** (such as causing the summons to be withdrawn and misusing protective orders as a pretext), Defendants violated Plaintiff's rights to **procedural due process** and **access to the courts**. Finally, the retaliatory motive behind their actions violates Plaintiff's **First Amendment rights**, as the government cannot punish an individual for filing lawsuits or FOIA requests by withholding police services to which the individual would otherwise be entitled.

30. All of the foregoing paragraphs are incorporated into each of the counts below as if fully set forth therein. Plaintiff now states the following causes of action:

## Count I – 42 U.S.C. § 1983 (Denial of Equal Protection)

31. **Equal Protection Violation:** Defendants **Lavin and Lowery**, acting under color of state law, have deprived Plaintiff of the right to equal protection of the laws guaranteed by the Fourteenth Amendment to the U.S. Constitution. Specifically, Defendants intentionally **singled out** Plaintiff for adverse treatment in the enforcement of the law, by refusing to enforce Virginia's child abduction statute on his behalf, **without any lawful or rational basis**. They selectively withheld police protection and investigative/prosecutorial action that would have been afforded to other similarly-situated complainants (or to the general public in cases of comparable criminal conduct).

32. Plaintiff was **similarly situated** to any parent with a valid court order whose child has been abducted in violation of that order. In Virginia, such conduct is a crime, and victims are entitled to have the law enforced. Yet, Plaintiff was denied the equal protection of the law because Defendants deliberately chose not to enforce § 18.2-49.1 against the offending mother *specifically in Plaintiff's case*. This decision was made not on the basis of a neutral policy (indeed, the policy is to enforce laws, not ignore them), but on improper considerations personal to Plaintiff and his situation.

33. **Selective Non-Enforcement:** The **unequal treatment** is evident: **for the mother**, Defendants created an exemption – she was effectively immunized from a law that applies to everyone – whereas **for Plaintiff**, the law's protection was withheld. Such **selective non-enforcement** of the law, when done with discriminatory intent or bad faith, is a core Equal Protection violation. The Equal Protection Clause prohibits officials from **enforcing or not enforcing laws in an arbitrary or discriminatory manner**. As one court noted in an analogous context, police and city officials have an *"affirmative duty to preserve law and order, and to protect the personal safety of persons in the community... This duty applies equally"* to all persons, and deliberate indifference to a person's plight that officials **know** is occurring can amount to a denial of equal protection. By consciously deciding that Plaintiff's complaint would **not** be pursued – when others would have received help – Defendants denied him the equal protection of the laws.

34. **No Legitimate Justification:** There was no valid, lawful justification for
    Defendants' disparate treatment of Plaintiff. The proffered reasons were
    pretextual and unreasonable. Protective orders do not automatically suspend
    court-ordered visitation; misdemeanors can be pursued out-of-state and, in any
    event, Plaintiff's case was a felony. Defendants' true motivations, as pleaded
    above, were illegitimate – namely, favoritism toward the mother (potentially based
    on gender bias or personal affinity) and malice or retaliation against Plaintiff.
    Even if Plaintiff were viewed as a "class-of-one," the differential treatment he
    received was **irrational and arbitrary**, stemming from animus and not any
    permissible distinction. Under **Village of Willowbrook v. Olech**, 528 U.S. 562
    (2000), such malicious or arbitrary singling-out violates equal protection.

35. **Disparate Impact of Policy/Custom:** Moreover, to the extent an official **policy
    or custom** of Albemarle County contributed to this outcome (see Count VI
    below), that policy/custom itself violates equal protection. A **departmental policy
    of inadequate response** to a certain category of cases (such as parental
    abductions arising from domestic disputes) compared to other offenses is
    unconstitutional if it results in systemic under-protection of a certain group. Here,
    it appears to be an entrenched custom for ACPD to **defer enforcement** of
    custody-related abductions to the CAO and to frequently decide *not* to enforce at
    all – a custom that disproportionately harms parents in Plaintiff's position. Such a
    custom has no defensible government interest and in fact **contravenes** the
    state's interest as embodied in § 18.2-49.1 (which was enacted to protect parents
    like Plaintiff from having their children unlawfully withheld). In **Thurman v. City of
    Torrington**, a federal court found that a city's practice of giving lesser police
    protection to victims of domestic violence (as opposed to other assault victims)
    violated equal protection, as it was intentional discrimination against a subclass
    of persons. The analogy applies: Albemarle's practice left Plaintiff, as a father in
    a custody dispute, with **less protection** than others get under similar criminal
    laws, due to who he is and who the offender was. This is unconstitutional.

36. **Injury:** As a direct and proximate result of this denial of equal protection, Plaintiff
    suffered the harms detailed above, including loss of time with his children,
    emotional pain, and the deprivation of his rights under the custody order. He was
    treated as a person **not worthy of police protection**, which is a stigmatic and
    tangible injury. The unequal treatment also led to concrete outcomes: no
    investigation, no service of process, no recovery of his children – whereas with
    equal treatment, those might have occurred.

37. **Liability of Named Defendants:** Defendants Lavin and Lowery are **personally liable** under § 1983 for this constitutional violation. Each was a direct participant in the decision to deny Plaintiff equal protection. They acted with the requisite discriminatory intent (demonstrated by their dismissive comments and pretexts). Their actions were under color of law and within the scope of their official duties, but not in furtherance of any lawful policy – rather, in furtherance of an unlawful conspiracy and/or custom. To the extent Defendant Reeves (Chief of Police) was aware of or ratified this selective non-enforcement (for example, by promulgating or tolerating the de facto policy of deferring to the conflicted CAO), he too violated equal protection; however, Plaintiff addresses the **municipal liability** aspect of this claim in Count VI, to avoid duplication. This Count I focuses on the direct wrongdoing by the individual officers.

38. **Prayer for Relief (Count I):** Plaintiff seeks compensatory damages against Lavin and Lowery for the equal protection violation, including damages for emotional distress and loss of familial companionship, in an amount to be determined at trial. Plaintiff also seeks declaratory and injunctive relief to ensure that Defendants (and ACPD) provide equal law enforcement services to Plaintiff and do not continue to deliberately ignore court orders in his case. Additionally, Plaintiff seeks punitive damages against Lavin and Lowery in their individual capacities, as their conduct was motivated by ill will or callous indifference to Plaintiff's rights.

## Count II – 42 U.S.C. § 1983 (Denial of Procedural Due Process / Access to Courts)

39. **Due Process Violation:** Defendants Lavin and Lowery, acting under color of state law, have deprived Plaintiff of rights secured by the Fourteenth Amendment's Due Process Clause. In particular, Plaintiff was denied **procedural due process** and his right of **access to the courts** when Defendants (in concert with others) **interfered with and effectively nullified the legal processes** that were in place to enforce the custody order and address the mother's violation.

40. Plaintiff had a lawful entitlement created by the December 17, 2024 court order – namely, the entitlement to visitation with his children. This visitation right is a form of **liberty interest** (as part of the parent-child relationship) protected by the Constitution. When the mother violated that right, Plaintiff turned to the state's legal machinery (courts and criminal justice) for a remedy. By **initiating a show-cause proceeding and obtaining a criminal summons**, Plaintiff invoked processes that are meant to **vindicate his rights**. These processes carry with them an expectation of fair treatment – e.g., that a scheduled court hearing will

occur and that a lawfully issued criminal charge will be pursued absent a valid reason for dismissal.

41. Defendants, however, **collaborated in thwarting these processes**. The most glaring example is the **deletion of the criminal case**. Although the direct act of removing the case from the docket may have been done by clerical and prosecutorial personnel (Bunch, Zug, Hingeley, Vradenburgh), Defendants Lavin and Lowery **acquiesced in and furthered that result** by refusing to object or take independent action. Indeed, Lowery indicated he was aware the CAO wanted the charge gone, and both officers told Plaintiff essentially to accept that outcome. By not challenging the spurious dismissal and by not assisting in any service of the summons, Lavin and Lowery **ratified the deprivation** of Plaintiff's due process. Law enforcement officers have been held liable under § 1983 for **failing to intervene** when other officials violate rights in their presence. Here, Lavin and Lowery knew Plaintiff's court access was being cut off, yet they **did nothing or helped it along**.

42. Furthermore, by misrepresenting the legal effect of the protective order and classifying the offense as a misdemeanor, Lavin and Lowery **effectively misled Plaintiff and the court system** about the true nature of the case. This contributed to the wrongful termination of the legal proceedings that Plaintiff had set in motion. In essence, **state actors jointly conspired to prevent Plaintiff from using the state courts to enforce his rights**, which is a serious denial of due process. The Fifth Circuit's decision in **Ryland v. Shapiro** is instructive: there, prosecutors were alleged to have concealed a murder (falsely calling it a suicide) to prevent the victim's family from discovering the truth and suing – the court recognized that such a cover-up, blocking access to courts, states a claim under § 1983. Analogously, Defendants here worked to **conceal or excuse the mother's wrongdoing**, calling it a non-criminal "custody issue" or a moot point due to a protective order, thereby preventing Plaintiff from securing a judicial determination of the matter.

43. **State-Created Danger / Worsening of Position:** Additionally, by explicitly telling Plaintiff that **no one would enforce the order**, Defendants placed Plaintiff in a worse position than if he had never sought help. Their statements and actions could be seen as communicating to the mother (directly or indirectly) that she could continue violating the order with impunity. This *encouragement by inaction* heightened the risk that Plaintiff's children would remain out of reach – effectively, the state (through Defendants) facilitated the ongoing deprivation of Plaintiff's parental rights. While generally due process does not require police to protect

individuals from private harm, an exception exists where the state's actions **affirmatively render a citizen more vulnerable** to that harm. Here, by halting the legal process and assuring no enforcement, Defendants arguably made Plaintiff more vulnerable to the continued violation of his custody rights.

44. **Conscience-Shocking Conduct:** The deliberate deletion of court records and intentional dereliction of duty alleged in this case "**shocks the conscience**" and offends fundamental fairness, meeting the standard for a substantive due process violation as well. However, Plaintiff primarily frames this as a procedural due process/access claim – that he was **denied the opportunity to be heard in a meaningful manner** regarding the custody order violation. The scheduled September 8, 2025 hearing would have been a formal opportunity; it was snatched away. The criminal process would have allowed Plaintiff to present evidence and have the law applied; it was shut down behind closed doors. No notice or hearing was provided to Plaintiff before these actions were taken – he was not consulted or allowed to object when the case was dropped. Such a secretive nullification of court process is the antithesis of due process.

45. **Causal Role of Defendants:** Defendants Lavin and Lowery cannot wash their hands of responsibility by pointing to the CAO or clerks. Under § 1983, anyone who **subjects, or causes to be subjected, a person to a rights deprivation** is liable. By their refusal to enforce, refusal to serve, and active cooperation with the CAO's stance, these Defendants were a **necessary link** in the chain of events that denied Plaintiff his day in court. If they had instead executed the summons or pressed the issue, the outcome could have been different. Their **joint understanding and meeting of the minds** with the non-parties to squash Plaintiff's case makes them full participants in the due process violation.

46. **Injury:** The consequences for Plaintiff include the ongoing loss of his visitation (a liberty interest) without due process of law, and the loss of his ability to **seek justice in state court**. This latter injury – the denial of access – is itself cognizable and distinct. Plaintiff has essentially been **foreclosed from utilizing any state legal mechanism** to address the abduction: the civil contempt route is stalled, the criminal route was closed, and even administrative avenues (like police assistance or interstate compact remedies) were blocked by Defendants' actions. Such a complete barricade inflicted by those acting under color of law is precisely what § 1983 is meant to redress.

47. **Prayer for Relief (Count II):** Plaintiff seeks declaratory relief establishing that Defendants' conduct – including the quashing of his magistrate-issued summons

and refusal to enforce the visitation order – violated his procedural due process rights. Injunctive relief is warranted to reopen access to legal mechanisms (for example, an injunction requiring Defendants to **facilitate the re-filing** of the criminal charge or otherwise assist in bringing the mother before a court). Plaintiff also seeks compensatory damages from Lavin and Lowery for the due process violation, including damages for the frustration, emotional distress, and loss of the chance to secure relief that he suffered. Punitive damages against the individual Defendants are appropriate as this conduct was egregious and in knowing disregard of Plaintiff's rights.

## Count III – 42 U.S.C. § 1983 (First Amendment Retaliation)

48. **Retaliation for Protected Activity:** Defendants Lavin and Lowery, acting under color of state law, have retaliated against Plaintiff for exercising his First Amendment rights, thereby violating the First Amendment (as incorporated against the states by the Fourteenth Amendment). The First Amendment protects Plaintiff's right to **speak**, to **petition the government for redress of grievances**, and to **seek information** (such as through Freedom of Information Act requests). This protection extends to the right to file lawsuits and complaints without facing retaliation by government officials.

49. **Protected Activity:** Plaintiff engaged in clearly protected activities, including: (a) filing FOIA requests with Albemarle County and court offices to obtain public records about his case; (b) complaining to police supervisors and county officials about the lack of enforcement (essentially criticizing government inaction); and (c) filing or preparing to file legal actions (such as the mentioned federal lawsuit against other officials) to challenge what he perceived as misconduct or dereliction. All of these actions are forms of petitioning the government or freedom of expression on matters of public concern (the functioning of the justice system). Under Fourth Circuit precedent, the First Amendment prohibits officials from subjecting a citizen to adverse action in retaliation for such protected conduct.

50. **Adverse Action:** Defendants Lavin and Lowery took adverse action against Plaintiff by **intentionally withholding police services and enforcement** that they otherwise would have provided. In other words, they **denied him equal law enforcement** (as detailed in Count I) *because* he was an annoyance to them through his FOIAing and litigating. This denial of service is an actionable retaliatory harm. While retaliation cases often involve things like arrests or fines, the principle is the same: if officials punish an individual by denying them some

benefit or protection they would normally receive, and if that denial is motivated by the individual's speech, it violates the First Amendment. Here, the "benefit" is the neutral enforcement of the law – something plainly valuable and whose denial would chill a person of ordinary firmness. Indeed, Plaintiff felt that by speaking up, he was *marked* as a troublemaker and thus punished with official indifference. Being told that his persistence and complaints are unwelcome, and then being refused help, would deter a person of ordinary firmness from continuing to press their grievances. (Plaintiff has persisted regardless, but the test is an objective one.)

51. **Causal Connection:** The chronology and Defendants' own remarks establish that Plaintiff's protected activity was a "substantial or motivating factor" in the adverse actions. Plaintiff had been seeking enforcement for months with little result, but it was after he ramped up his oversight – FOIA requests, involving higher-ups, and initiating separate legal action – that Defendants categorically shut him down. At the September 2 meeting, Sgt. Lowery referenced Plaintiff's previous emails/FOIA queries in a pejorative way, indicating annoyance. Detective Lavin's dismissive attitude toward Plaintiff ("you've been told, we're not doing anything") reflected not a professional evaluation of the case merits, but rather a personal impatience with Plaintiff's persistence. This evidences a retaliatory animus. Additionally, the **conspiracy** among officials to silence Plaintiff's efforts suggests they were trying to prevent him from further exposing their inaction or errors -- a retaliatory motive tied to his prior petitions.

52. But-for Plaintiff's protected conduct, Defendants would not have treated him this way. There is no indication that, absent Plaintiff being perceived as a gadfly, the police would routinely refuse to enforce a straightforward child abduction felony. In fact, common sense and any standard operating procedure would call for enforcement. It was Plaintiff's vocal challenge to the system that provoked the unusual stonewalling. Thus, Plaintiff's FOIA/petitioning activity was the **proximate cause** of Defendants' denial of services.

53. **No Legitimate Basis:** Defendants cannot assert a legitimate, non-retaliatory reason for their actions that is supported by the evidence. All their ostensible reasons (protective order, misdemeanor, etc.) have been exposed as pretextual or legally untenable. The remaining explanation is retaliation and/or personal dislike. Retaliation need not be the sole motive, but here it appears dominant. Even if Defendants also had some misguided legal view, the vehemence of their refusal and their references to Plaintiff's prior actions show the retaliatory animus

tipping the scales.

54. **Injury:** Plaintiff suffered specific harm as a result of the retaliation. The constitutional injury is the chilling effect and loss of First Amendment rights themselves – being punished for speaking out. Additionally, the retaliation resulted in the denial of police protection, which as described caused emotional distress, fear, and the tangible loss of the chance to regain contact with his children. The retaliatory act and the equal protection/due process violations are intertwined, but retaliation is a separate wrong because it targets Plaintiff's **dissent** and attempts to seek redress.

55. **Liability:** Defendants Lavin and Lowery are liable under § 1983 for this First Amendment violation. Each individually participated in the decision to retaliate. They were policymakers at least for that encounter (their decisions were final in Plaintiff's case, since they foreclosed any further action). There is no qualified immunity because the right to be free from retaliation for petitioning the government was clearly established long before 2025. A reasonable officer would know that you cannot deny help to a citizen *because* he filed complaints or lawsuits – that is basic First Amendment law.

56. **Prayer for Relief (Count III):** Plaintiff seeks compensatory damages against Lavin and Lowery for the First Amendment retaliation. These damages include compensation for emotional distress (insult, humiliation, frustration) caused by being retaliated against by those sworn to serve the public. Plaintiff also seeks a **declaratory judgment** that Defendants' refusal to enforce the law due to Plaintiff's FOIA requests/litigation was unconstitutional. Injunctive relief is warranted to prevent further retaliatory treatment – e.g., an order that Defendants/Albemarle Police must not refuse or delay service or investigation of Plaintiff's case on the basis of his past or future exercise of First Amendment rights. Plaintiff further requests punitive damages against the individual Defendants, as retaliation for exercising free speech shows reckless or callous disregard for Plaintiff's rights. Attorneys' fees (if Plaintiff were to later retain counsel or otherwise qualify) are available under 42 U.S.C. § 1988(b) because this is an action to enforce First Amendment rights via § 1983

## Count IV – 42 U.S.C. § 1985(3) (Conspiracy to Violate Civil Rights)

57. **Conspiracy Under § 1985(3):** Defendants Lavin and Lowery, together with the non-party co-conspirators named earlier (Clerks Bunch and Zug, CA Hingeley, ACA Vradenburgh, and Attorney Pustilnik), **conspired** to deprive Plaintiff of the

equal protection of the laws and/or of equal privileges and immunities, in violation of 42 U.S.C. § 1985(3). Section 1985(3) provides a cause of action when "two or more persons" conspire for the purpose of depriving any person of the **equal protection of the laws** or of **equal privileges and immunities under the laws**, and one or more of the conspirators do or cause to be done any act in furtherance of the object of the conspiracy, whereby the injured party is deprived of a right or privilege of a U.S. citizen.

58. **Agreement and Purpose:** Here, as detailed in the facts, there was an agreement – explicit or tacit – among the named Defendants and at least some of the non-parties to **obstruct Plaintiff's attempts to enforce his visitation/custody rights** and to **deny him the equal protection of the child abduction law**. The conspiracy's purpose was twofold: (a) **to impede, hinder, and defeat the due course of justice in Virginia** with intent to deny Plaintiff the equal protection of the laws (this invokes the related clause of § 1985(2) regarding obstruction in state courts); and (b) **to directly deprive Plaintiff of equal protection** by ensuring the law was not enforced equally in his case. In simple terms, the conspirators agreed that Plaintiff's case would be **shut down** and that the mother would face no consequences – effectively depriving Plaintiff of the protection of Virginia's laws that any other person in his situation should enjoy.

59. **Overt Acts:** Numerous overt acts were committed in furtherance of this conspiracy, including: (i) the **arranged dismissal** or withdrawal of the criminal summons on August 14, 2025 (coordinated between the CAO and clerks); (ii) the **September 2, 2025 meeting** where Lavin and Lowery, as conspirators, gave Plaintiff false reasons and definitively refused enforcement – an act which furthered the objective of depriving him of legal protection; (iii) the **misuse of protective orders** by conspirators (likely Attorney Pustilnik and ACA Vradenburgh) to create a pretext to block Plaintiff's visitation – and Lavin/Lowery's acceptance of that misuse; (iv) any **communications** between Hingeley's office and ACPD (including possibly with Chief Reeves or Sgt. Lowery) wherein it was decided that "we are not going to prosecute or help Azimi" – those communications evidence the meeting of minds; and (v) the general **pattern of delay and non-responsiveness** – for instance, clerks not properly entering or scheduling matters, or CAO ignoring Plaintiff – which was part of an understood approach to make Plaintiff give up. Each of these acts furthered the conspiracy's aim of denying Plaintiff equal legal protection and access.

60. **Class-Based Animus:** Section 1985(3) requires that the conspiracy be motivated by some class-based, invidiously discriminatory animus. Plaintiff asserts two possible bases which are pled in the alternative (either or both may be proven): **(a) Gender-based animus:** The conspirators' actions effectively favored a mother over a father, suggesting gender bias. Historically, failures to enforce domestic violence or custody laws have been linked to gender stereotypes (e.g., treating mothers as above the law or fathers as not deserving equal concern). If evidence shows that Albemarle's custom is to help mothers more than fathers in such disputes, that implies animus against fathers as a class (or against Plaintiff as a member of that class). Sex-based discrimination qualifies as an invidious classification under § 1985(3). **(b) Animus against those who petition the government:** Although not a traditional suspect class, courts have occasionally recognized **"class of one"** conspiracies or conspiracies aimed at individuals who exercise constitutional rights. Here, the group could be described as "citizens who challenge local officials' misconduct." The conspirators had a shared **animus against Plaintiff specifically because he was outspoken and was exposing their improper actions**. They might not hate all fathers, but they hated *this* father who wouldn't stay quiet. In the context of § 1985(2) (state-court obstruction), the statute explicitly covers conspiracies to retaliate against a party or witness for attending or testifying, etc. Here, the retaliation for Plaintiff's court/FOIA activities aligns with that spirit. In any event, Plaintiff alleges that **animus and malice** filled this conspiracy – it was not a good-faith policy disagreement but an effort fueled by dislike and bias toward Plaintiff (and/or toward his status as a father asserting rights).

61. **Resulting Deprivation:** The conspiracy succeeded (thus far) in its objective: Plaintiff was **injured and deprived of rights**. Specifically, he was deprived of **the equal protection of the laws** – as the law was not enforced for him – and **the privilege of the laws** – as he could not enjoy the normal privilege of invoking the courts for redress. He was also injured in his person and property in that he has expended resources and suffered emotional and relational harm due to the conspiracy. But for the conspirators' agreement and concerted acts, Plaintiff likely would have obtained relief (the mother being brought to court, maybe even reunification with children). The conspiracy thus directly caused the deprivation of Plaintiff's constitutional rights described in Counts I–III.

62. **Liability of Defendants: Detective Lavin and Sgt. Lowery** are liable under § 1985(3) as members of the conspiracy. They knowingly **agreed to the common plan** – evidenced by their coordinated stance on Sept. 2 and interactions with the CAO – and they performed acts (refusing enforcement, conveying false info to

Plaintiff) to further it. Although other conspirators (like the clerks and CAO) are not named as defendants here, § 1985 liability extends to *any* conspirator who causes harm. Joint and several liability applies. These Defendants cannot claim intra-governmental immunity for conspiracy because their actions were **outside the scope of any legitimate duty** and, moreover, involved multiple actors from different entities (police, prosecutor's office, court clerk's office – they are not all part of a single entity for conspiracy purposes, defeating the intra-corporate conspiracy doctrine). Additionally, the presence of the private attorney (Pustilnik) as a conspirator negates any such doctrine entirely.

63. **Prayer for Relief (Count IV):** Plaintiff seeks damages from Defendants Lavin and Lowery for their role in the § 1985(3) conspiracy. These damages include the same compensatory harms previously described. Because § 1985(3) allows recovery of damages caused "by such injury or deprivation" against "any one or more of the conspirators", Lavin and Lowery are liable for all harm caused by the conspiracy, even harm involving acts by their co-conspirators (such as the clerks' deletion of records). Plaintiff also seeks an award of **punitive damages** under this count, as the conspiracy was malicious. Furthermore, Plaintiff requests that the Court issue appropriate **equitable relief** (to be discussed in the final Prayer) to dismantle the conspiracy's effects – e.g., by ordering preservation of records (to prevent further cover-up) and by enjoining Defendants from further colluding to violate Plaintiff's rights. Finally, Plaintiff will seek attorneys' fees and costs under 42 U.S.C. § 1988 if applicable.

## Count V – 42 U.S.C. § 1986 (Neglect to Prevent Conspiracy)

64. **Knowledge and Power to Prevent:** This Count is pleaded in the alternative to Count IV. Defendant **Colonel Sean Reeves** (Chief of Police), in his individual capacity, is liable under 42 U.S.C. § 1986 for **neglecting to prevent** the conspiracy described in Count IV. Section 1986 provides that **any person who has knowledge of a § 1985 conspiracy, and power to prevent or aid in preventing it, and neglects or refuses to do so, shall be liable to the injured party for all damages caused by the conspiracy**.

65. **Defendant Reeves' Role:** As Chief of ACPD, Reeves was in a position of authority over Defendants Lavin and Lowery and had insight into high-profile or problematic cases. On information and belief, Chief Reeves was aware, or **should** have been aware, by early September 2025, that Plaintiff was complaining about a lack of enforcement and alleging a possible conspiracy among county officials. Plaintiff had copied or addressed communications to

police leadership and others. The abrupt dismissal of a magistrate's summons in a felony child abduction case is something that would or should come to the Chief's attention, especially if a citizen is loudly objecting. Assuming Reeves indeed knew that his subordinates (Lavin and Lowery) were, in coordination with the CAO, refusing to act on Plaintiff's case for improper reasons, then Reeves had both the **power** and the **duty** to intervene. As Chief, Reeves could have ordered an investigation, required enforcement of the law, or at minimum ensured Plaintiff's complaints were handled fairly.

66. **Neglect or Refusal:** Instead of intervening, Defendant Reeves **neglected to prevent** the ongoing violation of Plaintiff's rights. He took no action to countermand the unlawful agreement to leave Plaintiff without a remedy. If anything, by maintaining the department custom of deferring to the CAO, Reeves contributed to the environment that allowed the conspiracy to flourish. Reeves knew (actually or constructively) that the conspiracy's aim was unlawful – to deny equal protection and due process – yet he failed to exercise his authority to stop it. For example, upon hearing that the CAO wasn't pursuing the charge, Reeves could have assigned officers to gather evidence and present it to a magistrate or grand jury anyway. He did not. Upon hearing of Plaintiff's protests, Reeves could have reviewed the case and realized the protective order excuse was bogus; he did not correct his subordinates. This complacency is what § 1986 targets.

67. **One-Year Limit:** Plaintiff notes that a § 1986 claim has a statute of limitations of one year from the accrual of the cause of action. The primary events here occurred in August–September 2025, within one year of the filing of this Complaint, so this claim is timely.

68. **Damages:** Pursuant to § 1986, Reeves is liable for **all damages caused by the § 1985 conspiracy** that could have been prevented with due diligence. Essentially, this makes Reeves a sort of guarantor for the harm. The damages would mirror those in Count IV (and other counts), including emotional distress and loss of parental companionship, which could have been mitigated or avoided had the conspiracy been thwarted. While double recovery is not sought, Reeves is jointly liable for the conspiracy damages to the extent Lavin and Lowery might be unable to fully satisfy a judgment.

69. **Prayer for Relief (Count V):** Plaintiff seeks judgment against Sean Reeves (individually) under § 1986 for neglecting to prevent the wrongs described. This includes an award of compensatory damages equal to the amount of harm caused by the conspiracy from the time Reeves knew of it and could have acted.

In addition, although § 1986 does not explicitly mention punitive damages, Plaintiff seeks punitive or exemplary damages against Reeves for his callous disregard of Plaintiff's plight. The failure of a chief law enforcement officer to act in the face of an obvious conspiracy to violate civil rights is reprehensible and warrants punitive measures to deter such neglect in the future.

## Count VI – Monell Claim (Municipal Liability under 42 U.S.C. § 1983)

70. **Policy or Custom:** Defendant **County of Albemarle** (and, to the extent necessary, Defendant Reeves in his official capacity as Chief of ACPD) is liable under **Monell v. Department of Social Services, 436 U.S. 658 (1978)**, because the violations of Plaintiff's constitutional rights were caused by an official **policy, practice, or custom** of the County. A local government may be sued under § 1983 when the execution of its policy or custom by its officials **inflicts the injury** in question. Here, two interrelated customs/policies of Albemarle County were the "moving force" behind the violations:

a. **Policy of Deferring Enforcement to CAO:** Albemarle County, through its police department and decision-makers, had a policy (or longstanding practice) of **not enforcing Virginia Code § 18.2-49.1 (custodial parent abduction) without prior approval or initiation by the Commonwealth's Attorney's Office**. In effect, instead of treating the abduction of a child in violation of a court order as a normal criminal matter to be investigated and charged by police, Albemarle had a custom of **referring such complaints to the Commonwealth's Attorney and taking no independent action**. This custom is evidenced by Sgt. Lowery's statements that they would not act because the CAO wasn't acting. It is further supported by the fact that the magistrate's issuance of a summons (which bypassed the CAO initially) was undone after CAO intervention – indicating that the "policy" is that prosecution will only proceed if the CAO wants it. This deference amounts to an **abdication of police responsibility** and is not mandated by any Virginia law. (While coordination with prosecutors is normal, absolute deference when the prosecutor has a conflict or bias is not.) By following this policy, ACPD effectively **instituted selective enforcement** – because the CAO could arbitrarily decide who to prosecute (or who not to, as here). In Plaintiff's case, the policy allowed the CAO's improper motives to dictate law enforcement, thereby causing the constitutional deprivations (equal protection and due process) described above. **In other words, the County's policy put Plaintiff at the mercy of a conflicted official, rather than protecting him equally under law.**

b. **Custom of Misusing Protective Orders to Override Custody Orders:** Albemarle County (through its law enforcement and related agencies) maintained a custom of treating **protective orders** as automatically superseding or nullifying existing custody/visitation orders, without seeking clarification from the courts. This custom, perhaps borne from an over-cautious approach to domestic disputes, effectively means that if there is a domestic protective order in a case, the police will **decline to enforce any conflicting visitation order** on their own. While officer safety and victim safety are valid concerns, this custom goes too far: it allowed the mother (with help from others) to obtain a protective order (possibly with incomplete information given to the J&DR Court that issued it) and then use it as a shield against a valid visitation order. ACPD, following custom, took the protective order at face value as "cancelling" the visitation, even though they had no court instruction to that effect. This custom was **not officially written**, but it manifested in Lavin and Lowery's position and likely in other cases. The result is that **perpetrators of custodial interference could game the system** by getting a protective order and thus avoid enforcement of custody orders – a loophole that Albemarle's custom encourages. Such a custom is **contrary to law** (since only a court can modify its orders) and leads to constitutional harm: Plaintiff's familial rights were ignored and he was denied enforcement because of a one-sided approach. The misuse of protective orders in this way is something the County is responsible for training its officers about; the failure to properly train or the affirmative custom to "stand down" in presence of any PO is attributable to the County's policymakers (Chief Reeves, etc.). This custom contributed to the equal protection violation (because it was only applied selectively – likely favoring whomever had the protective order, usually mothers – and in this case it was the excuse to not help Plaintiff at all).

71. **Policymaker Involvement:** The above policies/customs were either formally adopted or at least **ratified by policymakers**. As Police Chief, Defendant Reeves had final authority over ACPD operations and made statements to the public endorsing cooperation with the Commonwealth's Attorney (possibly to a fault). If it is found that no written policy exists, Plaintiff asserts the practice was so widespread and known that the **County's leadership acquiesced in it**. There may also have been communications (memos, emails) between the CAO and ACPD memorializing that the CAO should be consulted first on any parental abduction charge – which would amount to a policy choice by the County to let the prosecutor's office decide. Under Monell, even an informal custom, if longstanding, imposes liability on the County. Additionally, after the fact, the County (through its officials) **failed to discipline or correct** the misconduct of Lavin and Lowery, effectively ratifying their actions as consistent with County policy.

72. **Moving Force and Causation:** The County's policy/custom was the **moving force** behind the violations of Plaintiff's rights. Had ACPD treated Plaintiff's complaint like any other felony (i.e., investigated and pursued a warrant irrespective of the CAO's personal stance), the outcome likely would have been different and constitutional injury avoided. Similarly, had ACPD properly trained officers that a civil protective order does not automatically quash a custody order (especially one that explicitly permits supervised contact), Defendants Lavin and Lowery would not have had that excuse to lean on. The existence of the policy/custom made it **predictable** that officers would do what they did to Plaintiff. In fact, Plaintiff's case demonstrates exactly the kind of harm that such a policy/custom, if unchecked, will systematically inflict: certain individuals (like Plaintiff) will be **denied equal justice** due to conflicts of interest or biases that the policy/custom negligently (or deliberately) allows to control.

73. **Deliberate Indifference:** To the extent that the County's liability is premised on failure to train or supervise, Plaintiff alleges that the County was **deliberately indifferent** to the obvious need to train its officers on handling custody order violations and the interplay of protective orders. Given the frequency of domestic relations issues, the County knew that without clear guidance, constitutional violations would occur (either by officers refusing to act or acting wrongly). The County's indifference is further shown by ignoring Plaintiff's numerous complaints – a reasonable official would realize something was amiss and step in, yet the County let it continue. This failure to act in light of foreseeable constitutional harm meets the Monell standard for deliberate indifference.

74. **Injuries Caused by County:** All the injuries described in prior counts were **proximately caused** by the County's policies/customs. Thus, the County is liable to Plaintiff for those injuries. Notably, because this is an official-capacity claim, **municipal immunity** does not apply (the County has no immunity for § 1983 claims in federal court), and **punitive damages are not sought against the County** (Plaintiff seeks punitive damages only from individual Defendants, as per City of Newport v. Fact Concerts). However, the County is subject to compensatory damages and to declaratory/injunctive relief.

75. **Prayer for Relief (Count VI):** Plaintiff seeks judgment against Albemarle County declaring that the above-described policies or customs are unconstitutional and that they led to the violation of Plaintiff's rights. Plaintiff seeks an **injunction** requiring Albemarle County and its Police Department to **change those policies** – for instance, to enforce Va. Code § 18.2-49.1 in a neutral manner without unlawful favoritism or de facto veto by the CAO, and to properly train officers

regarding concurrent orders (custody and protective orders) so that both are given effect lawfully (e.g., by returning to court for clarification rather than unilaterally deciding one nullifies the other). Plaintiff also seeks an award of compensatory damages against the County for the violations of his constitutional rights. These damages would cover the same categories as against individuals (emotional distress, etc.), as the County's liability encompasses the actions of its agents done per policy. Finally, should Plaintiff prevail, the County would be responsible for Plaintiff's attorneys' fees under 42 U.S.C. § 1988, as municipalities are often required to pay fee awards.

**Prayer for Relief**

**WHEREFORE,** Plaintiff Mohammed Azimi respectfully requests that the Court grant the following relief:

- **Declaratory Relief:** A judgment declaring that Defendants' actions and inactions – including the refusal to enforce Va. Code § 18.2-49.1 in Plaintiff's case, the misinterpretation of protective orders to suspend Plaintiff's visitation rights, the deletion of the magistrate's summons, and the conspiracy to deny Plaintiff equal protection and due process – **violated Plaintiff's rights** under the U.S. Constitution (specifically, the Fourteenth Amendment's Equal Protection and Due Process Clauses, and the First Amendment) and federal law. The declaratory judgment should further state that Albemarle County's policies or customs in this regard are unconstitutional as applied to Plaintiff.

- **Injunctive Relief:** A permanent injunction ordering Defendants to **cease their discriminatory non-enforcement** and to take affirmative steps to enforce the law neutrally with respect to Plaintiff's situation. This may include, **inter alia**: directing the Albemarle County Police (through Chief Reeves and the County) to **re-open** Plaintiff's criminal complaint against the mother or to assist an appropriate law enforcement agency in Virginia in pursuing charges under Va. Code § 18.2-49.1; prohibiting Defendants from giving effect to any protective order in a manner that violates the terms of Plaintiff's visitation order (unless and until a court of competent jurisdiction explicitly rules on any conflict); and requiring Defendants to **provide regular reports** to the Court on efforts made to locate and apprehend the offending mother or otherwise enforce the December 17, 2024 custody order. The injunction should also mandate that Albemarle County **train its officers** on the proper handling of custody order violations to prevent future constitutional violations.

- **Preventive Relief (Preservation of Evidence):** An order imposing a **litigation hold** and requiring Defendants and related entities (such as the Albemarle County Commonwealth's Attorney's Office and Clerk's Offices) to **preserve all records** relevant to this matter. This includes emails, text messages, case file notes, docket entries (including audit trails of any modifications to Plaintiff's case in court databases), NCIC/VCIN entries or inquiries, and any other documentation or communications from 2023 to present regarding Plaintiff, the custody/visitation order, the protective orders, and decisions about enforcement. Given the allegation of records being deleted (the summons), such an order is necessary to prevent further spoliation.

- **Compensatory Damages:** An award of compensatory damages, jointly and severally where applicable, against the **individual Defendants (Lavin, Lowery, Reeves)** and **Albemarle County**, in an amount to compensate Plaintiff for the violations of his constitutional rights. This includes damages for emotional distress, mental anguish, humiliation, loss of familial relationships, and any out-of-pocket expenses incurred due to Defendants' actions. Plaintiff leaves the exact amount to be determined at trial, but seeks an amount in the **hundreds of thousands of dollars** given the significance of the rights at stake and the harm suffered.

- **Punitive Damages:** An award of punitive damages against the individual Defendants **Lavin and Lowery** (in their individual capacities) for their willful, malicious, or reckless disregard of Plaintiff's rights. Punitive damages are also sought against **Sean Reeves** in his individual capacity for the § 1986 claim, to the extent allowed by law, due to his willful neglect in failing to prevent the conspiracy. (No punitive damages are sought against Albemarle County, in compliance with law.)

- **Attorneys' Fees and Costs:** An award of Plaintiff's litigation costs and reasonable attorneys' fees under 42 U.S.C. § 1988(b) and any other applicable provision, should Plaintiff prevail in this action. (Plaintiff notes that he is currently pro se, but if he later secures counsel or otherwise qualifies for fees, he reserves the right to seek such fees for the value of legal work expended.)

- **Referral for Prosecution:** Although this Court cannot itself prosecute, Plaintiff requests that the Court **formally refer** this matter to the U.S. Department of Justice for investigation of potential federal crimes by Defendants and co-conspirators. In particular, the Court should note the evidence of possible violations of **18 U.S.C. § 241 (conspiracy against rights), 18 U.S.C. § 242**

**(deprivation of rights under color of law)**, and **18 U.S.C. § 1519 (destruction or falsification of records in a federal investigation)**. Such a referral is warranted given the seriousness of officials possibly colluding to deprive civil rights and tampering with court records. (This referral would not affect the civil relief in this case, but serves the public interest in accountability.)

- **Any Other Relief:** Such other and further relief as the Court deems just and proper, including equitable relief tailored to ensure Plaintiff's constitutional rights are protected going forward and that Defendants' wrongdoing is not repeated. This may include Court oversight or periodic status conferences on the progress of enforcing the law in Plaintiff's case.

**Exhibits:** In support of this Complaint, Plaintiff attaches or will submit as exhibits (1) a certified copy of the December 17, 2024 Custody/Visitation Order; (2) copies of the relevant Protective Orders obtained by the mother (including the dates and terms, to show their scope relative to the visitation order); (3) a print-out or certificate of the J&DR Court docket entries around August–September 2025, demonstrating the show-cause scheduling and any irregular modifications; (4) a copy of the Magistrate's Criminal Complaint/Summons (OTN: 003JM2500005488) issued August 14, 2025 (or an affidavit from Plaintiff attesting to its issuance and terms, if the record is not available due to deletion); (5) any audio recordings or transcripts Plaintiff has of the August 14, 2025 proceeding (if any) and the September 2, 2025 meeting with Lavin and Lowery; (6) copies of email correspondence and letters between Plaintiff and Defendants or other officials from 2023–2025, evidencing Plaintiff's requests and the responses; and (7) any statistical or comparative evidence of other parental abduction cases in Albemarle (to support the selective enforcement claim). Plaintiff requests leave of Court to file these exhibits under seal or in camera if necessary (for privacy of minors), but will serve copies on Defendants.

**Jury Trial Demand:** Plaintiff hereby demands a trial by jury on all issues so triable.

**No Domestic Relations Modification Sought:** *Plaintiff emphasizes that he does **not** seek in this lawsuit any order altering the state court's custody or visitation determinations.* Plaintiff is not asking the federal court to award custody or change the supervised visitation into unsupervised, or any such thing. The sole aim of this action is to vindicate Plaintiff's federal constitutional rights and to ensure the **neutral enforcement of generally applicable criminal laws** and court orders. Plaintiff seeks the assistance of this Court only to require state actors to do their duty without discrimination or retaliation. This lawsuit thus **does not intrude upon ongoing domestic relations proceedings** nor ask the Court to make any child custody

judgment; it asks the Court to address the *constitutional wrongs* committed by those who impeded the enforcement of a valid state court order. Plaintiff respects the jurisdiction of the state court over family law matters and seeks only to compel Defendants to enforce the law in a constitutional manner.

Respectfully submitted,

DATED: 9.8.25

**Mohammed Azimi, Plaintiff Pro Se**